# Improper Discharge at Alaska Psychiatric Institute

## 2006

DRAFT

**Community Integrations/Investigation Unit Staff:**

Sonja Kerr, Esq.
Supervising Attorney

Holly Johanknecht, Esq.
Staff Attorney

Elizabeth Keating
Advocate

DRAFT

Ron Cowan
Advocate/Investigator

Case 3:06-cv-00062-TMB   Document 27-2   Filed 07/25/2006   Page 1 of 6

Exhibit _A_ page _1_ of _21_

# TABLE OF CONTENTS

I. BACKGROUND..................................................................................... 3

II. INTRODUCTION................................................................................. 4

III. EXECUTIVE SUMMARY..................................................................... 5

IV. SEQUENCE OF EVENTS..................................................................... 7

V. INVESTIGATIONS BY OTHER ENTITIES....................................... 10

VI. DLC'S INVESTIGATION................................................................... 11

VII. FINDINGS AND CONCLUSIONS..................................................... 13

VIII. RECOMMENDATIONS...................................................................... 19

Exhibit _A_ page _3_ of _21_

## I. Background

The Disability Law Center of Alaska (DLC) is an independent, private non-profit agency that protects and advocates for the rights of individuals with disabilities. DLC is Alaska's federally mandated Protection and Advocacy agency. Pursuant to the Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. § 10801(b), DLC has the authority to investigate incidents of abuse and neglect of persons with disabilities.

Alaska Psychiatric Institute is a state operated facility, which provides in-patient care and hospitalization for individuals with mental illness. API is under the directorship of Ron Adler.

## II.   Introduction

This report presents the Disability Law Center of Alaska's (DLC) investigation into an incident that occurred on March 5, 2006 at API. On this date, John Doe I[1] was discharged from API. Immediately after exiting the building, Mr. Doe removed his clothing and walked naked along the sidewalk towards Piper Street. According to the National Weather Service, the temperature reported on that day in Anchorage did not exceed 30 degrees Fahrenheit.

DLC learned of this incident when an employee of the Office of Public Advocacy (OPA) of the State of Alaska, contacted Dave Fleurant, Executive Director of the Disability Law Center of Alaska (DLC), regarding reports he had received about several incidents that had allegedly recently occurred at the Alaska Psychiatric Institute (API). According to the OPA employee, two API employees (the reporters) contacted him and reported three separate incidents of concern.

DLC staff met with OPA employees to discuss these incidents on March 20, 2006. One incident raised involved an individual being forced to leave API, who was not readmitted even after he immediately disrobed in front of the hospital's entrance (John Doe I – the subject of this report). With respect to the other two incidents, DLC has begun a preliminary investigation into one, and is considering conducting an investigation regarding the other.

The reporters also indicated that the incident involving John Doe I was captured on API's security cameras and that the footage would be destroyed within a short period of time, due to API's 30-day retention policy for security camera footage. The reporters also expressed their concern that the API administration would destroy the footage if it became aware of DLC's interest in this matter. After receiving these reports, DLC initiated an investigation into the incident involving John Doe I (hereinafter John Doe).

DLC would like to acknowledge the efforts of the initial reporters of these incidents whose willingness to get the information about the incident to a responsible third party (OPA) brought this situation to light. Individuals with disabilities are vulnerable and all of us, in the community, have a duty to protect and assist them when they are unable to help themselves.

---

[1] To protect the confidentiality of the victims, pseudonyms have been used.

## III. Executive Summary

John Doe is a 37-year-old man who was diagnosed with mental illness. His diagnoses include delusional disorder, personality disorder NOS (Not Otherwise Specified), malingering, bipolar disorder and obsessive compulsive disorder. His diagnoses for this particular admission, beginning on Saturday March 4, 2006 were delusional disorder and personality disorder NOS. At the time of the incident, he had been admitted to API 16 times beginning in December 2001. His admissions have been increasing in frequency.

According to Mr. Doe's records, he was admitted to API on the evening of Saturday, March 4, 2006. The police brought him to the Providence Hospital Emergency Room from the Brother Francis Shelter. Mr. Doe was then taken from Providence to API. Mr. Doe's records also state that his treating psychiatrist instructed that he should be discharged on Sunday, March 5, 2006, at 5:00 pm, as that is the time Brother Francis Shelter opened.[2]

On Sunday, March 5, 2005 at approximately 5:00 pm, Mr. Doe was discharged from API. According to staff present at the time, John Doe I was in his room on Susitna Unit when staff was informed that it was time for John Doe I to be discharged. Several staff members assisted John Doe I in getting dressed in his room, against his wishes. During that time Mr. Doe spit at a staff member, and consequently a spit hood was placed on his head. Once dressed, Mr. Doe was placed in a wheelchair and was escorted to the front door by four staff members. Mr. Doe was wheeled outside the building by staff of API.

Once outside, Mr. Doe proceeded to get out of the wheelchair, and removed all of his clothing, except for his socks.[3] An API staff member then removed the spit hood from Mr. Doe head and ran back inside the building. Mr. Doe, now naked except for a pair of socks, walked down the sidewalk along API, eventually making his way to Piper Street, near the intersection of Piper Street and Providence Drive. Once he neared Piper Street, Mr. Doe encountered several individuals who attempted to shield Mr. Doe and assist him. These individuals contacted the Anchorage Police Department. The police arrived shortly thereafter and one officer covered Mr. Doe with a blanket and took him in his police car.

The officer then escorted Mr. Doe back to API. However, API staff refused to admit Mr. Doe. The officer then took Mr. Doe to Providence Hospital where he was admitted and spent the night. The following day, Mr. Doe was readmitted to API on March 6, 2006 and is currently a patient there.

---

[2] The information contained in Mr. Doe's records conflicts with the information provided by ▆▆▆ in her interview with DLC staff. At the time of her interview, ▆▆▆ indicated that the decision to discharge Mr. Doe was made on the Friday prior to discharge, but according to the records Mr. Doe was not a patient at API at that time.
[3] The temperature in Anchorage on March 5 did not exceed 30 degrees Fahrenheit.

DLC investigated this incident to determine:
- A. Whether Mr. Doe was subject to abuse and/or neglect during the course of the incident,
- B. Whether Mr. Doe's discharge planning was appropriate,
- C. Whether API's policies and procedures regarding discharge planning are sufficient,
- D. Whether Mr. Doe's discharge (this incident) violated any state or federal regulations, or API's internal policies and procedures,
- E. Whether there are sufficient care and treatment options available to recently released patients in the community.

Based upon its investigation, DLC finds that:
- A. Mr. Doe was subject to neglect during the course of his discharge from API.
- B. Mr. Doe's discharge was inappropriate, both the plan itself and the manner in which the discharge was carried out.
- C. API's current policies and procedures are not sufficient in regards to discharge.
- D. Mr. Doe's discharge violated state and federal law, as well as a substantial number of API's policies and procedures.
- E. API failed to follow its own policies regarding the filing of Unusual Occurrence Reports (UOR), and State law regarding mandatory reporting.
- F. There are not sufficient transitional care and treatment options available in the community.

In addition to the above findings, this investigation was hampered by API's initial non-compliance with DLC's access rights. The investigation was only able to continue after a court order and a motion filed by DLC to compel compliance with that order. Additionally, the Center for Medicare/Medicaid Services (CMS) as well as the State's agency for Licensing & Certification have yet to comply with requests for information despite being provided with proof of DLC's access authority.