## IV. Sequence of Events

John Doe was admitted to API on Saturday, March 4, 2006 at approximately 5:20 pm. This admission was a Peace Officer's Application (POA). Mr. Doe was brought to Providence Hospital's Emergency Room from the Brother Francis Shelter by a police officer after he was found wandering around and not speaking. This was Mr. Doe's 16th admission to API since December of 2001. Mr. Doe's most recent previous admission to API was February 17, 2006. He was discharged to Brother Francis Shelter on February 27, 2006, less than one week prior to this incident.

On Sunday, March 5, 2005 at approximately 5:00 pm, Mr. Doe was discharged from API. According to staff present at the time, John Doe I was in his room on Susitna Unit when staff was informed that it was time for John Doe I to be discharged. Several staff members assisted John Doe I in getting dressed in his room, against his wishes. During that time Mr. Doe spit at a staff member, and consequently a spit hood was placed on his head on the order of the nursing shift supervisor. Once dressed, Mr. Doe was placed in a wheelchair and was escorted to the front door by four staff members, the nursing shift supervisor and three Psychiatric Nursing Assistants (PNAs). Two staff members wheeled Mr. Doe outside the building.

According to Mr. Doe's discharge plan, he was to be taken by taxi to Brother Francis Shelter. However, no taxi was present at API when Mr. Doe was wheeled outside, nor did one arrive at any time during the incident. Because DLC was unable to talk to the staff member who would have been responsible for calling a taxi for Mr. Doe, it is impossible to determine whether a taxi was actually called.

Once outside, Mr. Doe proceeded to get out of the wheelchair, and removed all of his clothing, except for his socks. At this time, the video camera in the parking lot zoomed in and began filming the incident.[4] An API staff member then removed the spit hood from Mr. Doe's head and ran back inside the building. Mr. Doe, now naked except for a pair of socks, walked down the sidewalk along API, eventually making his way to Piper Street, near the intersection of Piper Street and Providence Drive.

While Mr. Doe was undressing and walking away, the four staff members who escorted him stood inside the entryway to API. None of the staff members remember specifically saying anything to Mr. Doe as he undressed and walked away, but one individual thought that someone asked him to stop. The staff members present watched Mr. Doe walk away and then returned to work.[5] It is unclear how long the staff members stayed to watch Mr.

---

[4] The video footage clearly demonstrates that the camera was being actively operated, aimed, zoomed, and panned during this incident, indicating that at least one person (the security personnel) at API was fully aware of John Doe's actions as they were occurring.

[5] DLC was not able to interview all staff members present at the time of the incident, but the three interviewed reported returning to work.

7

Doe. One staff member specifically stated that he was not worried about Mr. Doe because it wasn't that cold outside.[6]

Once he neared Piper Street, Mr. Doe encountered several individuals who were driving by on 36th and/or Piper Street who attempted to shield Mr. Doe and assist him. These individuals contacted the Anchorage Police Department. The police arrived shortly thereafter. Two police cars arrived at the scene. The second officer, Officer Mitchell took a blanket out of his trunk and placed it around Mr. Doe. The officer then took Mr. Doe in his car.

When interviewed, one staff member stated that he paged Mr. Doe's doctor, ███████, who also happened to be the doctor on call at the time of the incident. ██████ was not physically at API at the time of the incident. When the staff member spoke with ██, ██ he asked her whether the police should be called. ██████ told the staff member that she wanted to speak with API's medical director ██████. ██████ called ██. ██████ and they determined that the appropriate response to this incident would be to call the police department to come and arrest Mr. Doe. ██████ relayed this decision to API staff. It is unclear when (if at all) API contacted the police department.[7]

The officer then escorted Mr. Doe back to API. Security cameras captured their return. This footage shows a police car arriving at the admissions door. The police officer goes inside for sometime, comes back out and speaks with the passenger (John Doe) and then returns into API. A short time later, the police officer returns with two API staff. They briefly remove John Doe I from the police car, and then return him to the backseat. The Officer and the API staff talk briefly and then the staff returns to API and the Officer gets back into his car and they drive off. API staff refused to admit Mr. Doe. The API staff working at the admissions area stated that they were instructed by ██████ not to re-admit Mr. Doe. The police report stated that API staff told the officer that Mr. Doe was not psychotic enough to be in API and that he was not a danger to himself or others. This staff also stated that the police officer did not attempt to do a POA, and that if he had done so, they would have been required to admit Mr. Doe.

The police officer then took Mr. Doe to Providence Hospital where he was admitted and spent the night. The following day, March 6, 2006, John Doe was readmitted to API. Since that readmission, he has been discharged, and readmitted to API.

Following the incident, none of the five staff members who witnessed the incident or anyone else at API reported the incident to API administration through the Unusual Occurrence Report or UOR process, or to Adult Protective Services (APS). API CEO, Ron Adler was told about the incident the following morning, Monday, March 6, 2006. However, when interviewed by DLC staff, Mr. Adler stated that because no staff

---

[6] According to the National Weather Service, the temperature in Anchorage on March 5 did not exceed 30 degrees Fahrenheit.

[7] The police report about the incident stated that when the police officer asked Dr. Khari why API did not contact the police, she stated that API staff had to call her, and she had to call her supervisor before APD could be notified, and that they were in the process of getting permission when APD found Mr. Doe.

completed an UOR, no action was taken in response to the incident at the time. API initiated an internal investigation after they received the lawsuit filed by DLC in an attempt to obtain copies of the video footage.

At the time of the interviews, no disciplinary action had been taken in response to the incident.

DRAFT

## V. Investigations by Other Entities

### A. API Internal Investigation

DLC obtained a copy of API's internal investigation. API interviewed all staff involved, including the security desk personnel and the charge nurse who is no longer working for API.[8] When interviewed by API, the staff members reported they were reluctant participants and that they did not agree with the actions initiated by the charge nurse/nursing supervisor.

API's conclusions appeared limited to placing the blame on one individual, the charge nurse/nursing supervisor. As mentioned earlier, API had taken no disciplinary action at the time DLC conducted its interviews.

### B. Police Report

DLC obtained the police report of the incident from the Anchorage Police Department. The police report reflected the incident as viewed on the video footage.[9] In the police report, the officer stated that when he attempted to return Mr. Doe to API, he was told that Mr. Doe was not mentally challenged enough to be in API. The officer responded "a naked man walking on the road in Alaska in March was not a normal thing to do." API staff informed the officer that Mr. Doe needed to go to jail instead of API. The officer took Mr. Doe to Providence Hospital where he was admitted.

### C. CMS/State Licensing

DLC attempted to obtain any information available about the incident from CMS and state licensing. The only documentary evidence obtained was a one-page document from CMS finding that API was not in violation of a federal regulation regarding emergency treatment. DLC continues to request further information from CMS, but no response has been received. Neither CMS nor the State's Licensing & Certification agency chose to evaluate API's compliance with other applicable regulations such as Discharge Planning or Patient's Rights.

---

[8] DLC was unable to interview either the security desk staff or charge nurse.
[9] DLC attempted to interview the Police Officer involved, however, that officer stated that he would not be able to be interviewed without a subpoena. DLC determined that in the interest of completing the report in a timely manner, it would not pursue a subpoena at this time.

## VI.   DLC's Investigation

Due to the concern of the reporters as to the possible destruction of the video surveillance tapes, the DLC chose to seek a court order to preserve the video recordings. Accordingly, on March 22, 2006, DLC filed suit in U.S. District Court requesting a Temporary Restraining Order requiring API to turn over to DLC any video surveillance of the events of March 5, 2006 concerning John Doe. Two days later, on March 24, 2006, Judge Burgess ruled on DLC's motions, denying the temporary restraining order, but ordering API, under threat of sanctions, to retain the video footage and further ordering that API must preserve any evidence within its possession relating to the incident.

On April 11, 2006, attorneys from DLC and attorneys from the Alaska Department of Law, who represent API met. The parties filed a joint status report and proposed order with the Court. In this status report, API agreed to cooperate with DLC providing access to staff and records so that DLC could complete its investigation in a timely manner, a projected thirty (30) day timeframe, and the DLC agreed to maintain the confidentiality of the information it gathered in the course of its investigation.

DLC staff viewed the video footage of the incident at API. DLC requested copies of the video footage, but were not accommodated until after the court order was received. DLC eventually obtained video footage of the incident, captured by several cameras in API's security system. The footage shows four staff members escorting John Doe being out of the Susitna Unit by wheelchair, brief glimpses of staff wheeling him through the hallways to the main entrance door, and Mr. Doe walking outside on the sidewalk towards Piper Street. In addition, there is footage that shows the police officer attempting to return Mr. Doe to API after the incident.

On April 19, 2006, interviews were scheduled with several API staff members beginning at 2:00pm. At 11:30am on that day, DLC received word from the Attorney General's Office that, because of confidentiality concerns, the interviews would not occur on that date, nor would they occur until the Judge signed the proposed order, which had been submitted on April 11. Due to API's cancellation of the interviews, DLC requested that the Court immediately approve the proposed order. On April 21, 2006 Judge Burgess signed the order again reiterating DLC's access to API patients, staff, administrators and records in order to complete its investigation. Once this order was received, arrangements were made for DLC staff to interview API staff and to obtain the records of John Doe.

DLC staff undertook interviews with a majority of the API staff members who were working on the day the incident occurred, as well as Mr. Doe's treating psychiatrist, API's executive director and API's medical director. API no longer employed one key staff member by the time DLC was permitted to interview staff. This staff member was the charge nurse of the evening shift and was the supervising staff member involved in the incident. DLC made repeated attempts to contact this individual, but no response was ever received. API was able to interview this individual for their internal investigation

11

Exhibit __A__ page __11__ of __21__