before he left API. One staff member refused to be interviewed by DLC. This individual was working in the security area of the lobby at the time of the incident. API was able to interview this individual for their internal investigation.

In addition to obtaining the video footage and interviewing API staff, DLC obtained the police report filed in response to the incident, copies of Mr. Doe's records from API, a copy of API's internal Policies and Procedures manual, and a copy of API's internal investigation.

## VII. Findings and Conclusions

### A. Mr. Doe was subject to neglect during the course of his discharge from API.

42 USC 10802 (5) of the Protection and Advocacy for Individuals with Mental Illness Act defines "neglect" as:

> **Negligent act or omission by any individual responsible for providing services in a facility rendering care or treatment which caused or may have caused injury or death to a individual with mental illness or which placed an individual with mental illness at risk of injury or death**, and includes an act or omission such as the failure to establish or carry out an appropriate individual program plan or treatment for an individual with mental illness, the failure to provide adequate nutrition, clothing or health care to an individual with mental illness, or the failure to provide a safe environment for an individual with mental illness, including the failure to maintain adequate numbers of appropriately trained staff.

(Emphasis added). It is clear that the staff responsible for escorting Mr. Doe out of the building after his discharge acted negligently. They failed Mr. Doe both in allowing him to undress and walk away, but also in the method they used to discharge him. These failures could have resulted in serious injury or death to Mr. Doe.

### B. Mr. Doe's discharge was inappropriate, both the plan itself and the manner in which the discharge was carried out.

Mr. Doe's discharge planning has been inadequate. He is consistently discharged to Brother Francis Shelter, follow-up appointments are not made for him, he is not discharged with medication, and despite the fact that he is indigent, and he is not provided with a reasonable amount of money as is required by state law. Considering Mr. Doe's consistent re-admissions to API, it is clear that this particular discharge plan is not working. In a recent admission, Mr. Doe was discharged to Brother Francis Shelter, only to be picked up there by the police less than a week later and re-admitted to API. It is obvious that this is not a successful discharge plan.

There were several indicators throughout the discharge process that should have alerted staff that Mr. Doe's discharge should not have continued. Perhaps if staff had been alerted to these signs, the incident might not have progressed as it did. The fist indicator should have been that staff had to dress Mr. Doe against his will. Secondly, they had to place a spit hood on Mr. Doe while dressing him and escorting him from the building. Third, they had to place Mr. Doe in a wheelchair in order to escort him out of the building. Fourth, even though he was placed in a wheelchair, Mr. Doe resisted discharge. Staff reported that he dragged his feet while they were escorting him out, making it

13

difficult to push the wheelchair. Finally, Mr. Doe undressed in the API parking lot. Any one of these occurrences should have indicated to staff that this was not going to be a typical discharge and that perhaps the doctor should be called and the discharge halted.

C.   **Mr. Doe's discharge violated state and federal law, as well as a substantial number of API's Policies and Procedures.**

<u>API Policies and Procedures</u>

**PC-50-5.5 Treatment Planning Process:** This P&P outlines the treatment planning process and its requirements. One requirement is the identification of a patient's problems, in specific, whether a problem is a discharge barrier. (PC-50-5.5 III(B)(1)). In Mr. Doe's case, after his many previous discharges, Mr. Doe has acted out certain behaviors that have led to his re-admission to API. API staff and psychiatrists were aware of these behaviors. One of these behaviors is disrobing or exposing himself in public, the exact behavior that this incident involved. This suggests a problem that should be considered and planned for in both his treatment and discharge plan, since it is clearly a barrier to a safe discharge.

**COC-30-13 Discharge Release of Patients:** John Doe was discharged at 5:00 pm on Sunday, March 5, 2005. This, by all accounts is an unusual time for a discharge. In addition, it is contrary to API policy which states that "[d]ischarges should, whenever possible, be scheduled for regular business hours." No evidence suggests a legitimate and programmatically appropriate reason not to discharge Mr. Doe during regular business hours. Discharging during normal business hours ensures that API is fully staffed, which might prevent similar incidents from happening in the future. It also increases the likelihood of a successful discharge to another facility whose staff can be contacted if difficulties occur.

**COC-30-13.02 Funds for Indigent Patients on Discharge:** This policy states that when a patient is indigent, they are to be provided with a reasonable amount of money. This policy echoes the requirement in A.S. 47.30.890. There is no evidence in Mr. Doe's records that he was provided with any money on his discharge. However, there is a note in the records however that Mr. Doe did not have any money when he was admitted. Mr. Doe was to be discharged to a homeless shelter, so he was presumably indigent and should have been provided with money.

**SC-30-2.1 Restriction of Patients' Rights:** This section states, "Any restriction of patient rights will be done in a manner, which maintains the dignity, well being, and safety of each patient." In this case, Mr. Doe was subjected to several restrictions of his rights, including being forcefully dressed, a spit mask placed on his head, and being placed in a wheelchair and escorted from the building, regardless of his resistance. These restrictions were not done in a way that maintained his dignity, well-being or safety.

**Laws and Regulations**

**AS 47.30.825 Patient Medical Rights:** Alaska law requires that "A patient upon discharge shall be given a discharge plan specifying the kinds and amount of care and treatment the patient should have after discharge and such other steps as the patient might take to benefit the patient's mental health after leaving the facility."

There is no evidence that Mr. Doe was provided with such a plan when he was discharged from API on March 5, 2006. According to Mr. Doe's psychiatrist, Mr. Doe was to be sent, by taxi, to a homeless shelter. Additionally, Mr. Doe was not provided with any medication on his discharge, nor were any follow-up appointments made for Mr. Doe.

**AS 47.30.809 Provision for Personal Needs Upon Discharge:** This section places three requirements on the department at the discharge of a patient. First, that "a patient is not discharged from a treatment facility without suitable clothing" And second, that an indigent patient is provided with "(A) suitable transportation to the patient's permanent residence in this state or to another suitable place at the discretion of the department; and finally, (B) a reasonable amount of money to meet the patient's immediate needs." In this instance, API violated several requirements of this statute.

Mr. Doe was not supplied with suitable transportation at the time of his discharge. He was supposed to take a taxi, but there was no taxi waiting for him. DLC was unable to determine if a taxi was ever called for Mr. Doe as the operator/security personnel who would have been responsible for this refused to be interviewed by DLC.

Additionally there is no evidence that Mr. Doe was provided with any money at his discharge. Mr. Doe, without question meets the definition of an indigent patient, as he was being discharged to a homeless shelter.

**42 CFR 482.43(b)(4) Discharge Planning:** "The discharge planning evaluation must include an evaluation of the likelihood of a patient's capacity for self-care or of the possibility of the patient being cared for in the environment from which he or she entered the hospital." Section (c) (4 & 5) goes on to say that: "the hospital must reassess the patient's discharge plan if there are factors that may affect continuing care needs or the appropriateness of the discharge plan. As needed, the patient and family members or interested persons must be counseled to prepare them for post-hospital care."

Based upon the hospital's own identification that John Doe's presenting problems included his desire not to be discharged and the events that followed, it is clear the above requirements were not fulfilled.

**42 C.F.R 489.24 Special Responsibilities of Medicare Hospitals in Emergency Cases:** This is the federal regulation reviewed by the Alaska Division of Public Health, Certification and Licensing (Licensing) in their investigation into the incident at API.

This regulation deals with what care must be provided by a hospital when a patient needs emergency care. When an individual presents on hospital property (including sidewalks and parking lots) with an emergency medical condition, that hospital must treat or stabilize them.

These regulations define presenting at a hospital as including "if a prudent layperson observer would believe, based on the individual's behavior, that the individual needs emergency examination or treatment." An emergency medical condition is defined as, "A medical condition manifesting itself by acute symptoms of sufficient severity (including ... psychiatric disturbances...) such that the absence of immediate medical attention could reasonably be expected to result in placing the health of the individual ...in serious jeopardy."

It is not unreasonable to think that a prudent layperson observer, seeing a naked man walking down the sidewalk, in Alaska in March would believe that that man needs emergency treatment. It is also not unreasonable to believe that a person's health would be in serious jeopardy by walking down the sidewalk naked, in Alaska, in March. However, Licensing found that API was in compliance with the requirements of this regulation. In order to gain further insight into Licensing's determination, DLC has requested a copy of their report, however, one has not yet been provided.

C. API's current policies and procedures are not sufficient in regards to discharge.

At this time, there is no API policy to address a patient who resists or refuses discharge. This incident is not the first time a patient at API has resisted discharge, DLC is aware of at least one other incident that has occurred in recent years. API staff response to this incident was similarly inappropriate, the police were called and the individual was arrested for trespassing. It is clear that API staff needs guidance in how to respond in this type of situation.

DLC has found that API has no established method for dealing with patients who refuse or resist discharge. This is a glaring lack in policy that, as this incident has shown, can have serious consequences for both patients and staff. During its interviews with API staff, DLC learned of at least one other instance, in recent years of a patient resisting discharge and API staff responded by calling the police. One incident of this nature should have been sufficient to encourage API to create a policy to aid its staff in dealing with this type of situation.

Another lack in current API policy is a policy that outlines under what circumstances it is appropriate to contact the police to deal with a patient during discharge. Using the police as a solution to patient discharge issues criminalizes mental illness and does nothing to solve the underlying problem.

E.  **API failed to follow its own policies regarding the filing of Unusual Occurrence Reports (UOR), and State law regarding mandatory reporting.**

<u>API Policies and Procedures</u>

**HR-30-5 Conduct Involving Patients:** This section regulates patient care and staff interaction with patients. It states, "[p]atients at Alaska Psychiatric Institute (API) have the right to treatment in a setting that provides physical safety, emotional support, and freedom from abuse or inappropriate treatment." To ensure staff is aware of this important policy, API requires that all staff sign a statement that they have read and understand it.

In addition, this policy requires that any staff that is aware of misconduct occurring at API must report it to hospital authorities and any other required State authorities. Employees that fail to do so are subject to disciplinary action.[10] In addition, any API employee who is found to have engaged in any of a list of prohibited behaviors will be terminated absent extreme and clear-cut mitigating circumstances.[11]

When a staff member observes staff misconduct directed towards a patient, they must immediately notify their direct supervisor, prepare an Unusual Occurrence Report (UOR), and submit the UOR to risk management within 24 hours. No UOR was prepared by any of the involved employees regarding this incident. Through its investigation, DLC has identified at least 5 employees who directly witnessed the incident, yet none of them prepared a UOR.

In addition, this policy requires that when an employee "witnesses, receives reports of, or has reasonable cause to believe that an unreported incident of patient abuse, neglect or assault has occurred" they must report the incident to the appropriate law enforcement agency for investigation. In this case, a report should have been made, within 24 hours, to the Department of Administration, Division of Senior Services. There is no evidence that such a report was ever made.

This is an extremely serious violation of API policy. It is very disturbing that all five witnesses failed to complete a UOR and failed to report this incident to the Department of Administration, Division of Senior Services. In their interviews with API, several staff members indicated that they were concerned about Mr. Doe and that they were uncomfortable with his treatment, however, none of these individuals reported the incident as required by both API policy and Alaska state law.

---

[10] At the time DLC interviewed API CEO Ron Adler, no staff member had been disciplined for their failure to complete a UOR in response to the incident.

[11] The listed behaviors include – (1) physical abuse or excessive roughness toward a patient, or physical contact that exceeds therapeutic bounds and (5) neglecting or endangering a patient. At the time DLC interviewed the API staff about the incident, none had been disciplined for their actions (or failure to act) in the incident.