When a UOR is submitted, API determines whether it needs to initiate an investigation. Because no UOR was submitted for this incident, API's internal investigation was not initiated until DLC became involved. Despite these failures, at the time DLC interviewed API staff and administration, no employee had been disciplined

Alaska Law

AS 47.24.010 **Reports of Harm**: Alaska law requires certain individuals, to report incidents of abuse and neglect involving vulnerable adults.[12] In this case, there are several individuals who should have been required to make a report in about this incident but who failed to do so. All mental health professionals (doctors), police officers, administrators of health care facilities, social workers and certified nurses aids are required by law to report to Adult Protective Services when they have reasonable cause to believe that the abuse or neglect of a vulnerable adult has occurred. There is no evidence that a report of this incident was ever made to APS.

F.   There are not sufficient transitional care and treatment options available in the community.

In its interview with API CEO Ron Adler, DLC discovered that when a patient does not have housing of their own, and they do not have family who will take them in, it is not uncommon to discharge such a patient to a homeless shelter. Such was the case with Mr. Doe. It seems clear that some type of transitional care should be made available to homeless and indigent patients to ensure they receive appropriate care and treatment after discharge before they are released to the streets.

---

[12] AS 47.24.010

## VIII. Recommendations

**A.    API must establish new discharge planning requirements.**

DLC recommends that API pay increased attention to discharge planning. Mr. Doe's discharge planning was inappropriate not only in the manner it was effected, but also the plan itself. Mr. Doe was supposed to be taken by taxi to a homeless shelter. For a person with Mr. Doe's complex mental health situation, this is not an appropriate discharge. The inappropriateness of this plan is evidenced by Mr. Doe's prior similar discharges (at least three), where shortly after discharge to a shelter he was readmitted to API. Obviously Mr. Doe is in need of an alternative discharge plan.

DLC recommends that all appropriate staff and administration be given specific training in the development of discharge plans by a source mutually agreed upon between DLC and API. The function of this training will be to assist staff to creatively plan for discharge and thus to avoid incidents of this nature.

**B.    API must establish new policies regarding patients who refuse or resist discharge.**

Given the lack of any API policy that addresses how to deal with patients who resist or refuse discharge, DLC recommends that API create a policy addressing such a situation. DLC was informed of at least one other situation when a patient refused to be discharged and API staff acted inappropriately in that situation as well.

This policy must also address under what circumstances it is appropriate to contact the police when a patient refuses or resists discharge, and what protocols must be followed when those circumstances occur.

**C.    API staff must receive training on API policy requirements.**

Due to the large number of violations of API policy, it is obvious that there is a need for increased staff training on API policy, especially in regards to UORs and staff obligations regarding patient abuse and neglect. The current practice of having staff read and sign portions of the policy is not effective. API should conduct a mandatory training for all staff and administration that provides an in-depth look at API's policy and procedures and the obligations they impose on staff.

**D.    All API staff must receive training on their obligations to report incidents of abuse and neglect, as well as training on how to recognize and prevent abuse and neglect.**

No one at API reported this incident to Adult Protective services as is required by Alaska law. This is a serious failure and steps must be taken to ensure that it does not happen in the future. DLC recommends that all appropriate staff and administration be given specific training in their obligations as mandatory reporters, as well as how to recognize

and prevent abuse and neglect of patients by a source mutually agreed upon between DLC and API.

E.  **Increased cooperation between DLC and API**

DLC recommends continued DLC presence at API. A DLC advocate now has desk and phone and badge to get around API, so she is better able to meet with patients. This is a good step and a sign of increased collaboration between API and DLC.

Another recommendation is more cooperation and a better understanding between API and DLC in regards to DLC's access authority. Throughout this investigation DLC faced substantial resistance from API when attempting to exercise its statutory authority in obtaining records or interviewing staff. This resistance caused a significant delay in conducting and completing the investigation. Outside of the initial court involvement when DLC attempted to obtain a copy of the video footage, DLC had to resort to court involvement on several occasions to obtain evidence it was statutorily entitled to.

It is in the best interest of both parties if API and their attorney's at the Office of the Attorney General are better informed about DLC's access authority in order to prevent similar problems from occurring in the future. This education will ensure that future investigations can be completed in a timely manner without court involvement and improve relations between API and DLC with the ultimate goal of ensuring that patients at API have improved experiences at API as well as successful discharges.

F.  **CMS and the State's Licensing & Certification agency should evaluate all applicable state and federal requirements following an incident.**

As mentioned elsewhere in this report, both CMS and the State's Licensing & Certification agency limited their investigation surrounding this incident to evaluating API's compliance with federal requirements under the Emergency Medical Treatment and Active Labor Act (EMTALA).

Given the circumstances surrounding the incident itself, it is clear that other Conditions of Participation, Standards or other regulations could have been violated. Indeed, based on the results of DLC's investigation, it was determined other regulations had been violated. As the agencies charged with certifying and licensing API, the scope of review must be broader and encompass all applicable standards to ensure patient safety and quality of care.

G.  **Increased cooperation between DLC and CMS and the State's Licensing & Certification agency.**

During the course of DLC's investigation, reports and other information were requested from CMS and the State's Licensing & Certification agency, all of which were denied. The formal requests, which cited the federal laws guaranteeing DLC access to such materials, were never responded to. In light of those laws and federal mandates, and

insofar as DLC, CMS and the State's Licensing & Certification agency have similar mandates and responsibilities for investigating complaints, it is clear greater cooperation is not only mandated, but would better serve patients.

In an effort to facilitate increased cooperation, DLC will be contacting these and other agencies in the near future to set up a meeting to discuss how to improve inter-agency cooperation and effectiveness.

H. **Alaska is in need of new care and treatment options in the community for patients recently released from API.**

According to Mr. Doe's records and interviews with API CEO Ron Adler and ▇▇▇▇, there was no where to discharge Mr. Doe to other than the homeless shelter. Mr. Doe did not have his own home, he was not welcome to live with his family, he did not have an assisted living facility, his only option was the shelter. This clearly demonstrates the lack of care and treatment options available in the community. Mr. Doe is not the only API patient who has nowhere to go after discharge; it is a serious problem that needs attention. The State needs new options for transitional care for those individuals who are homeless or without resources as a result of their stay in API.