# Improper Discharge at Alaska Psychiatric Institute

# July 25, 2006

**Disability Law Center of Alaska**
**Community Integrations/Investigation Unit Staff**:

Sonja Kerr, Esq.
Supervising Attorney

Holly Johanknecht, Esq.
Staff Attorney


Elizabeth Keating
Advocate

Ron Cowan
Advocate/Investigator

3330 Arctic Blvd., Suite 103
Anchorage, Alaska 99503
(907)565-1002

# TABLE OF CONTENTS

I.      BACKGROUND…………………………………………… 3

II.     INTRODUCTION………………………………………… 4

III.    EXECUTIVE SUMMARY……………………………….... 5

IV.     SEQUENCE OF EVENTS……………………………… 7

V.      INVESTIGATIONS BY OTHER ENTITIES……………………10

VI.     DLC'S INVESTIGATION……………………………….. 11

VII.    FINDINGS AND CONCLUSIONS……………………… 13

VIII.   RECOMMENDATIONS…………………………………. 19

## I. Background

The Disability Law Center of Alaska (DLC) is an independent, private non-profit agency that protects and advocates for the rights of individuals with disabilities. DLC is Alaska's federally mandated Protection and Advocacy agency. Pursuant to the Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. § 10801(b), DLC has the authority to investigate incidents of abuse and neglect of persons with disabilities.

Alaska Psychiatric Institute is a state operated facility, which provides in-patient care and hospitalization for individuals with mental illness. API is under the directorship of Ron Adler.

## II.    Introduction

This report presents the Disability Law Center of Alaska's (DLC) investigation into an incident that occurred on March 5, 2006 at API. On this date, John Doe[1] was discharged from API. Immediately after exiting the building, Mr. Doe removed his clothing and walked naked along the sidewalk towards Piper Street. According to the National Weather Service, the temperature reported on that day in Anchorage did not exceed 30 degrees Fahrenheit.

DLC learned of this incident when an employee of the Office of Public Advocacy (OPA) of the State of Alaska, contacted Dave Fleurant, Executive Director of the Disability Law Center of Alaska (DLC), regarding reports he had received about several incidents that had allegedly recently occurred at the Alaska Psychiatric Institute (API). According to the OPA employee, two API employees (the reporters) contacted him and reported three separate incidents of concern.

DLC met with OPA staff to discuss these incidents on March 20, 2006. One incident raised involved an individual being forced to leave API, who was not readmitted even after he immediately disrobed in front of the hospital's entrance (John Doe I – the subject of this report).  With respect to the other two incidents, DLC has begun a preliminary investigation into one, and is considering conducting an investigation regarding the other.

The reporters also indicated that the incident involving John Doe I was captured on API's security cameras and that the footage would be destroyed within a short period of time, due to API's 30-day retention policy for security camera footage. The reporters also expressed their concern that the API administration would destroy the footage if it became aware of DLC's interest in this matter. After receiving these reports, DLC initiated an investigation into the incident involving John Doe I (hereinafter John Doe or Mr. Doe).

DLC would like to acknowledge the efforts of the initial reporters of these incidents whose willingness to get the information about the incident to a responsible third party (OPA) brought this situation to light. Individuals with disabilities are vulnerable and all of us, in the community, have a duty to protect and assist them when they are unable to help themselves.

---

[1] To protect the confidentiality of the victims, pseudonyms have been used.

### III.    Executive Summary

John Doe is a 37-year-old man who was diagnosed with mental illness. His diagnoses include delusional disorder, personality disorder NOS (Not Otherwise Specified), malingering, bipolar disorder and obsessive compulsive disorder. His diagnoses for this particular admission, beginning on Saturday March 4, 2006 were delusional disorder and personality disorder NOS. At the time of the incident, he had been admitted to API 16 times beginning in December 2001. His admissions have been increasing in frequency.

According to Mr. Doe's records, he was admitted to API on the evening of Saturday, March 4, 2006. The police brought him to the Providence Hospital Emergency Room from the Brother Francis Shelter. Mr. Doe was then taken from Providence to API. Mr. Doe's records also state that his treating psychiatrist[2] instructed that he should be discharged on Sunday, March 5, 2006, at 5:00 pm, as that is the time Brother Francis Shelter opened.[3]

On Sunday, March 5, 2005 at approximately 5:00 pm, Mr. Doe was discharged from API. According to staff present at the time, John Doe I was in his room on Susitna Unit when staff was informed that it was time for John Doe I to be discharged. Several staff members assisted John Doe I in getting dressed in his room, against his wishes. During that time Mr. Doe spit at a staff member, and consequently a spit hood was placed on his head. Once dressed, Mr. Doe was placed in a wheelchair and was escorted to the front door by four staff members. Mr. Doe was wheeled outside the building by staff of API.

Once outside, Mr. Doe proceeded to get out of the wheelchair, and removed all of his clothing, except for his socks.[4] An API staff member then removed the spit hood from Mr. Doe head and ran back inside the building. Mr. Doe, now naked except for a pair of socks, walked down the sidewalk along API, eventually making his way to Piper Street, near the intersection of Piper Street and Providence Drive. Once he neared Piper Street, Mr. Doe encountered several individuals who attempted to shield Mr. Doe and assist him. These individuals contacted the Anchorage Police Department. The police arrived shortly thereafter and one officer covered Mr. Doe with a blanket and took him in his police car.

The officer then escorted Mr. Doe back to API. However, API staff refused to admit Mr. Doe. The officer then took Mr. Doe to Providence Hospital where he was admitted and spent the night. The following day, Mr. Doe was readmitted to API on March 6, 2006 and is currently a patient there.

---

[2] The names of Mr. Doe's treating psychiatrist and the API medical director have been changed in response to a pending protective order filed by the Office of the Attorney General. The treating psychiatrist will be referred to as Dr. A, and the medical director as Dr. B.

[3] The information contained in Mr. Doe's records conflicts with the information provided by Dr. A in her interview with DLC staff. At the time of her interview, Dr. A indicated that the decision to discharge Mr. Doe was made on the Friday prior to discharge, but according to the records Mr. Doe was not a patient at API at that time.

[4] The temperature in Anchorage on March 5 did not exceed 30 degrees Fahrenheit.

DLC investigated this incident to determine:

    A.    Whether Mr. Doe was subject to abuse and/or neglect during the course of the incident,

    B.    Whether Mr. Doe's discharge planning was appropriate,

    C.    Whether API's policies and procedures regarding discharge planning are sufficient,

    D.    Whether Mr. Doe's discharge (this incident) violated any state or federal regulations, or API's internal policies and procedures,

    E.    Whether there are sufficient care and treatment options available to recently released patients in the community.

Based upon its investigation, DLC finds that:

    A.    Mr. Doe was subject to neglect during the course of his discharge from API.

    B.    Mr. Doe's discharge was inappropriate, both the plan itself and the manner in which the discharge was carried out.

    C.    API's current policies and procedures are not sufficient in regards to discharge.

    D.    Mr. Doe's discharge violated state and federal law, as well as a substantial number of API's policies and procedures.

    E.    API failed to follow its own policies regarding the filing of Unusual Occurrence Reports (UOR), and State law regarding mandatory reporting.

    F.    There are not sufficient transitional care and treatment options available in the community.

In addition to the above findings, this investigation was hampered by API's initial non-compliance with DLC's access rights. The investigation was only able to continue after a court order and a motion filed by DLC to compel compliance with that order. Additionally, the Center for Medicare/Medicaid Services (CMS) as well as the State's agency for Certification & Licensing have yet to comply with requests for information despite being provided with proof of DLC's access authority.

## IV.    Sequence of Events

John Doe was admitted to API on Saturday, March 4, 2006 at approximately 5:20 pm. This admission was a Peace Officer's Application (POA). Mr. Doe was brought to Providence Hospital's Emergency Room from the Brother Francis Shelter by a police officer after he was found wandering around and not speaking. This was Mr. Doe's 16th admission to API since December of 2001. Mr. Doe's most recent previous admission to API was February 17, 2006. He was discharged to Brother Francis Shelter on February 27, 2006, less than one week prior to this incident.

On Sunday, March 5, 2005 at approximately 5:00 pm, Mr. Doe was discharged from API. According to staff present at the time, John Doe I was in his room on Susitna Unit when staff was informed that it was time for John Doe I to be discharged. Several staff members assisted John Doe I in getting dressed in his room, against his wishes. During that time Mr. Doe spit at a staff member, and consequently a spit hood was placed on his head on the order of the nursing shift supervisor. Once dressed, Mr. Doe was placed in a wheelchair and was escorted to the front door by four staff members, the nursing shift supervisor and three Psychiatric Nursing Assistants (PNAs). Two staff members wheeled Mr. Doe outside the building.

According to Mr. Doe's discharge plan, he was to be taken by taxi to Brother Francis Shelter. However, no taxi was present at API when Mr. Doe was wheeled outside, nor did one arrive at any time during the incident. Because DLC was unable to talk to the staff member who would have been responsible for calling a taxi for Mr. Doe, it is impossible to determine whether a taxi was actually called.

Once outside, Mr. Doe proceeded to get out of the wheelchair, and removed all of his clothing, except for his socks. At this time, the video camera in the parking lot zoomed in and began filming the incident.[5] An API staff member then removed the spit hood from Mr. Doe**'s** head and ran back inside the building. Mr. Doe, now naked except for a pair of socks, walked down the sidewalk along API, eventually making his way to Piper Street, near the intersection of Piper Street and Providence Drive.

While Mr. Doe was undressing and walking away, the four staff members who escorted him stood inside the entryway to API. None of the staff members remember specifically saying anything to Mr. Doe as he undressed and walked away, but one individual thought that someone asked him to stop. The staff members present watched Mr. Doe walk away and then returned to work.[6] It is unclear how long the staff members stayed to watch Mr.

---

[5] The video footage clearly demonstrates that the camera was being actively operated, aimed, zoomed, and panned during this incident, indicating that at least one person (the security personnel) at API was fully aware of John Doe's actions as they were occurring.

[6] DLC was not able to interview all staff members present at the time of the incident, but the three interviewed reported returning to work.

Doe. One staff member specifically stated that he was not worried about Mr. Doe because it wasn't that cold outside.[7]

Once he neared Piper Street, Mr. Doe encountered several individuals who were driving by on 36th and/or Piper Street who attempted to shield Mr. Doe and assist him. These individuals contacted the Anchorage Police Department. The police arrived shortly thereafter. Two police cars arrived at the scene. The second officer, Officer Mitchell took a blanket out of his trunk and placed it around Mr. Doe. The officer then took Mr. Doe in his car.

When interviewed, one staff member stated that he paged Mr. Doe's doctor, Dr. A, who also happened to be the doctor on call at the time of the incident. Dr. A was not physically at API at the time of the incident. When the staff member spoke with Dr. A he asked her whether the police should be called. Dr. A told the staff member that she wanted to speak with API's medical director Dr. B. Dr. A called Dr. B and they determined that the appropriate response to this incident would be to call the police department to come and arrest Mr. Doe. Dr. A relayed this decision to API staff. It is unclear when (if at all) API contacted the police department.[8]

The officer then escorted Mr. Doe back to API. Security cameras captured their return. This footage shows a police car arriving at the admissions door. The police officer goes inside for sometime, comes back out and speaks with the passenger (John Doe) and then returns into API. A short time later, the police officer returns with two API staff. They briefly remove John Doe I from the police car, and then return him to the backseat. The Officer and the API staff talk briefly and then the staff returns to API and the Officer gets back into his car and they drive off.  API staff refused to admit Mr. Doe. The API staff working at the admissions area stated that they were instructed by Dr. A not to re-admit Mr. Doe. The police report stated that API staff told the officer that Mr. Doe was not psychotic enough to be in API and that he was not a danger to himself or others. This staff also stated that the police officer did not attempt to do a POA, and that if he had done so, they would have been required to admit Mr. Doe.

The police officer then took Mr. Doe to Providence Hospital where he was admitted and spent the night. The following day, March 6, 2006, John Doe was readmitted to API. Since that readmission, he has been discharged, and readmitted to API.

Following the incident, none of the five staff members who witnessed the incident or anyone else at API reported the incident to API administration through the Unusual Occurrence Report or UOR process, or to Adult Protective Services (APS). API CEO, Ron Adler was told about the incident the following morning, Monday, March 6, 2006. However, when interviewed by DLC staff, Mr. Adler stated that because no staff

---

[7] According to the National Weather Service, the temperature in Anchorage on March 5 did not exceed 30 degrees Fahrenheit.

[8] The police report about the incident stated that when the police officer asked Dr. A why API did not contact the police, she stated that API staff had to call her, and she had to call her supervisor before APD could be notified, and that they were in the process of getting permission when APD found Mr. Doe.

completed an UOR, no action was taken in response to the incident at the time. API initiated an internal investigation after they received the lawsuit filed by DLC in an attempt to obtain copies of the video footage.

At the time of the interviews, no disciplinary action had been taken in response to the incident.

## V.     Investigations by Other Entities

### A.     API Internal Investigation

DLC obtained a copy of API's internal investigation. API interviewed all staff involved, including the security desk personnel and the charge nurse who is no longer working for API.[9] When interviewed by API, the staff members reported they were reluctant participants and that they did not agree with the actions initiated by the charge nurse/nursing supervisor.

API's conclusions appeared limited to placing the blame on one individual, the charge nurse/nursing supervisor. As mentioned earlier, API had taken no disciplinary action at the time DLC conducted its interviews.

### B.     Police Report

DLC obtained the police report of the incident from the Anchorage Police Department. The police report reflected the incident as viewed on the video footage.[10] In the police report, the officer stated that when he attempted to return Mr. Doe to API, he was told that Mr. Doe was not mentally challenged enough to be in API. The officer responded "a naked man walking on the road in Alaska in March was not a normal thing to do." API staff informed the officer that Mr. Doe needed to go to jail instead of API. The officer took Mr. Doe to Providence Hospital where he was admitted.

### C.     CMS/State Licensing

DLC attempted to obtain any information available about the incident from CMS and state licensing. The only documentary evidence obtained was a one-page document from CMS finding that API was not in violation of a federal regulation regarding emergency treatment. DLC continues to request further information from CMS, but no response has been received.  Neither CMS nor the State's Certification & Licensing agency chose to evaluate API's compliance with other applicable regulations such as Discharge Planning or Patient's Rights.

---

[9] DLC was unable to interview either the security desk staff or charge nurse.

[10] DLC attempted to interview the Police Officer involved, however, that officer stated that he would not be able to be interviewed without a subpoena. DLC determined that in the interest of completing the report in a timely manner, it would not pursue a subpoena at this time.

## VI.    DLC's Investigation

Due to the concern of the reporters as to the possible destruction of the video surveillance tapes, the DLC chose to seek a court order to preserve the video recordings. Accordingly, on March 22, 2006, DLC filed suit in U.S. District Court requesting a Temporary Restraining Order requiring API to turn over to DLC any video surveillance of the events of March 5, 2006 concerning John Doe. Two days later, on March 24, 2006, Judge Burgess ruled on DLC's motions, denying the temporary restraining order, but ordering API, under threat of sanctions, to retain the video footage and further ordering that API must preserve any evidence within its possession relating to the incident.

On April 11, 2006, attorneys from DLC and attorneys from the Alaska Department of Law, who represent API met. The parties filed a joint status report and proposed order with the Court. In this status report, API agreed to cooperate with DLC providing access to staff and records so that DLC could complete its investigation in a timely manner, a projected thirty (30) day timeframe, and the DLC agreed to maintain the confidentiality of the information it gathered in the course of its investigation.

DLC staff viewed the video footage of the incident at API. DLC requested copies of the video footage, but were not accommodated until after the court order was received. DLC eventually obtained video footage of the incident, captured by several cameras in API's security system. The footage shows four staff members escorting John Doe being out of the Susitna Unit by wheelchair, brief glimpses of staff wheeling him through the hallways to the main entrance door, and Mr. Doe walking outside on the sidewalk towards Piper Street. In addition, there is footage that shows the police officer attempting to return Mr. Doe to API after the incident.

On April 19, 2006, interviews were scheduled with several API staff members beginning at 2:00pm. At 11:30am on that day, DLC received word from the Attorney General's Office that, because of confidentiality concerns, the interviews would not occur on that date, nor would they occur until the Judge signed the proposed order, which had been submitted on April 11. Due to API's cancellation of the interviews, DLC requested that the Court immediately approve the proposed order. On April 21, 2006 Judge Burgess signed the order again reiterating DLC's access to API patients, staff, administrators and records in order to complete its investigation. Once this order was received, arrangements were made for DLC staff to interview API staff and to obtain the records of John Doe.

DLC staff undertook interviews with a majority of the API staff members who were working on the day the incident occurred, as well as Mr. Doe's treating psychiatrist, API's executive director and API's medical director. API no longer employed one key staff member by the time DLC was permitted to interview staff. This staff member was the charge nurse of the evening shift and was the supervising staff member involved in the incident. DLC made repeated attempts to contact this individual, but no response was ever received. API was able to interview this individual for their internal investigation

11

before he left API. One staff member refused to be interviewed by DLC. This individual was working in the security area of the lobby at the time of the incident. API was able to interview this individual for their internal investigation.

In addition to obtaining the video footage and interviewing API staff, DLC obtained the police report filed in response to the incident, copies of Mr. Doe's records from API, a copy of API's internal Policies and Procedures manual, and a copy of API's internal investigation.

On June 14, 2006, Mr. Doe contacted DLC advocate Elizabeth Keating to discuss the incident. Ms. Keating met with Mr. Doe at API on June 15, 2006 and on several other instances since. Mr. Doe stated that he was unable to recall the events surrounding his discharge. He also stated that he was not aware of DLC's investigation into the incident until shortly before he contacted DLC. DLC attempted, on previous occasions to meet with Mr. Doe but he unwilling to cooperate.

## VII.    Findings and Conclusions

### A.    Mr. Doe was subject to neglect during the course of his discharge from API.

42 USC 10802 (5) of the Protection and Advocacy for Individuals with Mental Illness Act defines "neglect" as:

> **Negligent act or omission by any individual responsible for providing services in a facility rendering care or treatment which caused or may have caused injury or death to a individual with mental illness or which placed an individual with mental illness at risk of injury or death**, and includes an act or omission such as the failure to establish or carry out an appropriate individual program plan or treatment for an individual with mental illness, the failure to provide adequate nutrition, clothing or health care to an individual with mental illness, or the failure to provide a safe environment for an individual with mental illness, including the failure to maintain adequate numbers of appropriately trained staff.

(Emphasis added). It is clear that the staff responsible for escorting Mr. Doe out of the building after his discharge acted negligently. They failed Mr. Doe both in allowing him to undress and walk away, but also in the method they used to discharge him. These failures could have resulted in serious injury or death to Mr. Doe.

### B.    Mr. Doe's discharge was inappropriate, both the plan itself and the manner in which the discharge was carried out.

Mr. Doe's discharge planning has been inadequate. He is consistently discharged to Brother Francis Shelter, follow-up appointments are not made for him, he is not discharged with medication, and despite the fact that he is presumably indigent, he is not provided with a reasonable amount of money as is required by state law. Considering Mr. Doe's consistent re-admissions to API, it is clear that this particular discharge plan is not working. In a recent admission, Mr. Doe was discharged to Brother Francis Shelter, only to be picked up there by the police less than a week later and re-admitted to API. It is obvious that this is not a successful discharge plan.

There were several indicators throughout the discharge process that should have alerted staff that Mr. Doe's discharge should not have continued. Perhaps if staff had been alerted to these signs, the incident might not have progressed as it did. The fist indicator should have been that staff had to dress Mr. Doe against his will. Secondly, they had to place a spit hood on Mr. Doe while dressing him and escorting him from the building. Third, they had to place Mr. Doe in a wheelchair in order to escort him out of the building. Fourth, even though he was placed in a wheelchair, Mr. Doe resisted discharge.

Staff reported that he dragged his feet while they were escorting him out, making it difficult to push the wheelchair. Finally, Mr. Doe undressed in the API parking lot. Any one of these occurrences should have indicated to staff that this was not going to be a typical discharge and that perhaps the doctor should be called and the discharge halted.

**C.      Mr. Doe's discharge violated state and federal law, as well as a substantial number of API's Policies and Procedures.**

**API Policies and Procedures**

**PC-50-5.5 Treatment Planning Process:** This P&P outlines the treatment planning process and its requirements. One requirement is the identification of a patient's problems, in specific, whether a problem is a discharge barrier. (PC-50-5.5 III(B)(1)). In Mr. Doe's case, after his many previous discharges, Mr. Doe has acted out certain behaviors that have led to his re-admission to API. API staff and psychiatrists were aware of these behaviors. One of these behaviors is disrobing or exposing himself in public, the exact behavior that this incident involved. This suggests a problem that should be considered and planned for in both his treatment and discharge plan, since it is clearly a barrier to a safe discharge.

**COC-30-13 Discharge Release of Patients:** John Doe was discharged at 5:00 pm on Sunday, March 5, 2005. This, by all accounts is an unusual time for a discharge. In addition, it is contrary to API policy which states that "[d] ischarges should, whenever possible, be scheduled for regular business hours." No evidence suggests a legitimate and programmatically appropriate reason not to discharge Mr. Doe during regular business hours. Discharging during normal business hours ensures that API is fully staffed, which might prevent similar incidents from happening in the future. It also increases the likelihood of a successful discharge to another facility whose staff can be contacted if difficulties occur.

**COC-30-13.02 Funds for Indigent Patients on Discharge:** This policy states that when a patient is indigent, they are to be provided with a reasonable amount of money. This policy echoes the requirement in A.S. 47.30.890. There is no evidence in Mr. Doe's records that he was provided with any money on his discharge. However, there is a note in the records however that Mr. Doe did not have any money when he was admitted. Mr. Doe was to be discharged to a homeless shelter, so he was presumably indigent and should have been provided with money.

**SC-30-2.1 Restriction of Patients' Rights:** This section states, "Any restriction of patient rights will be done in a manner, which maintains the dignity, well being, and safety of each patient." In this case, Mr. Doe was subjected to several restrictions of his rights, including being forcefully dressed, a spit mask placed on his head, and being placed in a wheelchair and escorted from the building, regardless of his resistance. These restrictions were not done in a way that maintained his dignity, well-being or safety.

**Laws and Regulations**

**AS 47.30.825 Patient Medical Rights:** Alaska law requires that "A patient upon discharge shall be given a discharge plan specifying the kinds and amount of care and treatment the patient should have after discharge and such other steps as the patient might take to benefit the patient's mental health after leaving the facility."

There is no evidence that Mr. Doe was provided with such a plan when he was discharged from API on March 5, 2006. According to Mr. Doe's psychiatrist, Mr. Doe was to be sent, by taxi, to a homeless shelter. Additionally, Mr. Doe was not provided with any medication on his discharge, nor were any follow-up appointments made for Mr. Doe.

**AS 47.30.809 Provision for Personal Needs Upon Discharge:** This section places three requirements on the department at the discharge of a patient. First, that "a patient is not discharged from a treatment facility without suitable clothing" And second, that an indigent patient is provided with "(A) suitable transportation to the patient's permanent residence in this state or to another suitable place at the discretion of the department; and finally, (B) a reasonable amount of money to meet the patient's immediate needs." In this instance, API violated several requirements of this statute.

Mr. Doe was not supplied with suitable transportation at the time of his discharge. He was supposed to take a taxi, but there was no taxi waiting for him. DLC was unable to determine if a taxi was ever called for Mr. Doe as the operator/security personnel who would have been responsible for this refused to be interviewed by DLC.

Additionally there is no evidence that Mr. Doe was provided with any money at his discharge. Mr. Doe, without question meets the definition of an indigent patient, as he was being discharged to a homeless shelter.

**42 CFR 482.43 Discharge Planning:** Subsection (b)(4) states that **"**The discharge planning evaluation must include an evaluation of the likelihood of a patient's capacity for self-care or of the possibility of the patient being cared for in the environment from which he or she entered the hospital." Section (c)(4 & 5) goes on to say that: "the hospital must reassess the patient's discharge plan if there are factors that may affect continuing care needs or the appropriateness of the discharge plan. As needed, the patient and family members or interested persons must be counseled to prepare them for post-hospital care."

Based upon the hospital's own identification that John Doe's presenting problems included his desire not to be discharged and the events that followed, it is clear the above requirements were not fulfilled.

**42 CFR 489.24 Special Responsibilities of Medicare Hospitals in Emergency Cases:** This is the federal regulation reviewed by the Alaska Division of Public Health,

Certification and Licensing (C&L) in their investigation into the incident at API. This regulation deals with what care must be provided by a hospital when a patient needs emergency care. When an individual presents on hospital property (including sidewalks and parking lots) with an emergency medical condition, that hospital must treat or stabilize them.

These regulations define presenting at a hospital as including "if a prudent layperson observer would believe, based on the individual's behavior, that the individual needs emergency examination or treatment." An emergency medical condition is defined as, "A medical condition manifesting itself by acute symptoms of sufficient severity (including … psychiatric disturbances…) such that the absence of immediate medical attention could reasonably be expected to result in placing the health of the individual …in serious jeopardy."

It is not unreasonable to think that a prudent layperson observer, seeing a naked man walking down the sidewalk, in Alaska in March would believe that that man needs emergency treatment. It is also not unreasonable to believe that a person's health would be in serious jeopardy by walking down the sidewalk naked, in Alaska, in March. However, C&L found that API was in compliance with the requirements of this regulation. In order to gain further insight into C&L's determination, DLC has requested a copy of their investigative report, however, one has not yet been provided.  The only document provided by C&L was a Statement of Deficiencies indicating no deficiencies had been found.

### C.    API's current policies and procedures are not sufficient in regards to discharge.

At this time, there is no API policy to address a patient who resists or refuses discharge. This incident is not the first time a patient at API has resisted discharge, DLC is aware of at least one other incident that has occurred in recent years. API staff response to this incident was similarly inappropriate, the police were called and the individual was arrested for trespassing. It is clear that API staff needs guidance in how to respond in this type of situation.

DLC has found that API has no established method for dealing with patients who refuse or resist discharge. This is a glaring lack in policy that, as this incident has shown, can have serious consequences for both patients and staff. During its interviews with API staff, DLC learned of at least one other instance, in recent years of a patient resisting discharge and API staff responded by calling the police. One incident of this nature should have been sufficient to encourage API to create a policy to aid its staff in dealing with this type of situation.

Another lack in current API policy is a policy that outlines under what circumstances it is appropriate to contact the police to deal with a patient during discharge. Using the police as a solution to patient discharge issues criminalizes mental illness and does nothing to solve the underlying problem.

**E.**    **API failed to follow its own policies regarding the filing of Unusual Occurrence Reports (UOR), and State law regarding mandatory reporting.**

**API Policies and Procedures**

**HR-30-5 Conduct Involving Patients:** This section regulates patient care and staff interaction with patients. It states, "[p]atients at Alaska Psychiatric Institute (API) have the right to treatment in a setting that provides physical safety, emotional support, and freedom from abuse or inappropriate treatment." To ensure staff is aware of this important policy, API requires that all staff sign a statement that they have read and understand it.

In addition, this policy requires that any staff that is aware of misconduct occurring at API must report it to hospital authorities and any other required State authorities. Employees that fail to do so are subject to disciplinary action.[11] In addition, any API employee who is found to have engaged in any of a list of prohibited behaviors will be terminated absent extreme and clear-cut mitigating circumstances.[12]

When a staff member observes staff misconduct directed towards a patient, they must immediately notify their direct supervisor, prepare an Unusual Occurrence Report (UOR), and submit the UOR to risk management within 24 hours. No UOR was prepared by any of the involved employees regarding this incident. Through its investigation, DLC has identified at least 5 employees who directly witnessed the incident, yet none of them prepared a UOR.

In addition, this policy requires that when an employee "witnesses, receives reports of, or has reasonable cause to believe that an unreported incident of patient abuse, neglect or assault has occurred" they must report the incident to the appropriate law enforcement agency for investigation. In this case, a report should have been made, within 24 hours, to the Department of Administration, Division of Senior Services. There is no evidence that such a report was ever made.

This is an extremely serious violation of API policy. It is very disturbing that all five witnesses failed to complete a UOR and failed to report this incident to the Department of Health and Social services, Division of Senior and Disability Services, Adult Protective Services. In their interviews with API, several staff members indicated that they were concerned about Mr. Doe and that they were uncomfortable with his treatment, however, none of these individuals reported the incident as required by both API policy and Alaska state law.

---

[11] At the time DLC interviewed API CEO Ron Adler, no staff member had been disciplined for their failure to complete a UOR in response to the incident.

[12] The listed behaviors include – (1) physical abuse or excessive roughness toward a patient, or physical contact that exceeds therapeutic bounds and (5) neglecting or endangering a patient. At the time DLC interviewed the API staff about the incident, none had been disciplined for their actions (or failure to act) in the incident.

When a UOR is submitted, API determines whether it needs to initiate an investigation. Because no UOR was submitted for this incident, API's internal investigation was not initiated until DLC became involved. Despite these failures, at the time DLC interviewed API staff and administration, no employee had been disciplined

**Alaska Law**

**AS 47.24.010 Reports of Harm**: Alaska law requires certain individuals, to report incidents of abuse and neglect involving vulnerable adults.[13] In this case, there are several individuals who should have been required to make a report in about this incident but who failed to do so. All mental health professionals (doctors), police officers, administrators of health care facilities, social workers and certified nurses aids are required by law to report to Adult Protective Services when they have reasonable cause to believe that the abuse or neglect of a vulnerable adult has occurred. There is no evidence that a report of this incident was ever made to APS.

**F.      There are not sufficient transitional care and treatment options available in the community.**

In its interview with API CEO Ron Adler, DLC discovered that when a patient does not have housing of their own, and they do not have family who will take them in, it is not uncommon to discharge such a patient to a homeless shelter. Such was the case with Mr. Doe. It seems clear that some type of transitional care should be made available to homeless and indigent patients to ensure they receive appropriate care and treatment after discharge before they are released to the streets.

**G.      The Centers for Medicare and Medicaid Services (CMS), as well as the state's Certification and Licensing agency (C&L) failed to evaluate API's compliance with all applicable laws and regulations.**

As mentioned elsewhere in this report, both CMS and C&L limited their investigation into this incident to evaluating API's compliance with 42 CFR 489.24 Special Responsibilities of Medicare Hospitals in Emergency Cases.  While DLC disagrees with CMS' and C&L's determination that the hospital was in compliance with those requirements, both CMS and C&L failed to evaluate the hospital's compliance with other applicable statutes and regulations.  While perhaps not exhaustive, DLC determined the hospital was not in compliance with the following state statutes and federal regulations: AS 47.30.825 Patient Medical Rights; AS 47.30.809 Provision for Personal Needs Upon Discharge; and 42 CFR 482.43 Discharge Planning

---

[13] AS 47.24.010

## VIII.   Recommendations

### A.     API must establish new discharge planning requirements.

DLC recommends that API pay increased attention to discharge planning. Mr. Doe's discharge planning was inappropriate not only in the manner it was effected, but also the plan itself. Mr. Doe was supposed to be taken by taxi to a homeless shelter. For a person with Mr. Doe's complex mental health situation, this is not an appropriate discharge. The inappropriateness of this plan is evidenced by Mr. Doe's prior similar discharges (at least three), where shortly after discharge to a shelter he was readmitted to API. Obviously Mr. Doe is in need of an alternative discharge plan.

DLC recommends that all appropriate staff and administration be given specific training in the development of discharge plans by a source mutually agreed upon between DLC and API. The function of this training will be to assist staff to creatively plan for discharge and thus to avoid incidents of this nature.

### B.     API must establish new policies regarding patients who refuse or resist discharge.

Given the lack of any API policy that addresses how to deal with patients who resist or refuse discharge, DLC recommends that API create a policy addressing such a situation. DLC was informed of at least one other situation when a patient refused to be discharged and API staff acted inappropriately in that situation as well.

This policy must also address under what circumstances it is appropriate to contact the police when a patient refuses or resists discharge, and what protocols must be followed when those circumstances occur.

### C.     API staff must receive training on API policy requirements.

Due to the large number of violations of API policy, it is obvious that there is a need for increased staff training on API policy, especially in regards to UORs and staff obligations regarding patient abuse and neglect. The current practice of having staff read and sign portions of the policy is not effective. API should conduct a mandatory training for all staff and administration that provides an in-depth look at API's policy and procedures and the obligations they impose on staff.

### D.     All API staff must receive training on their obligations to report incidents of abuse and neglect, as well as training on how to recognize and prevent abuse and neglect.

No one at API reported this incident to Adult Protective services as is required by Alaska law. This is a serious failure and steps must be taken to ensure that it does not happen in the future. DLC recommends that all appropriate staff and administration be given specific training in their obligations as mandatory reporters, as well as how to recognize

and prevent abuse and neglect of patients by a source mutually agreed upon between DLC and API.

**E.    Increased cooperation between DLC and API**

DLC recommends continued DLC presence at API. A DLC advocate now has desk and phone and badge to get around API, so she is better able to meet with patients. This is a good step and a sign of increased collaboration between API and DLC.

Another recommendation is more cooperation and a better understanding between API and DLC in regards to DLC's access authority. Throughout this investigation DLC faced substantial resistance from API when attempting to exercise its statutory authority in obtaining records or interviewing staff. This resistance caused a significant delay in conducting and completing the investigation. Outside of the initial court involvement when DLC attempted to obtain a copy of the video footage, DLC had to resort to court involvement on several occasions to obtain evidence it was statutorily entitled to.

It is in the best interest of both parties if API and their attorney's at the Office of the Attorney General are better informed about DLC's access authority in order to prevent similar problems from occurring in the future. This education will ensure that future investigations can be completed in a timely manner without court involvement and improve relations between API and DLC with the ultimate goal of ensuring that patients at API have improved experiences at API as well as successful discharges.

**F.    CMS and the State's Certification & Licensing agency should evaluate all applicable state and federal requirements following an incident.**

As mentioned elsewhere in this report, both CMS and the State's Certification & Licensing agency limited their investigation surrounding this incident to evaluating API's compliance with federal requirements under the Emergency Medical Treatment and Active Labor Act (EMTALA).

Given the circumstances surrounding the incident itself, it is clear that other Conditions of Participation, Standards or other regulations could have been violated. Indeed, based on the results of DLC's investigation, it was determined other statutes and regulations had been violated. As the agencies charged with certifying and licensing API, the scope of review must be broader and encompass all applicable requirements to ensure patient safety and quality of care.

**G.    Increased cooperation between DLC and CMS and the State's Certification & Licensing agency.**

During the course of DLC's investigation, reports and other information were requested from CMS and the State's Certification & Licensing agency, all of which were denied. The formal requests, which cited the federal laws guaranteeing DLC access to such materials, were never responded to. In light of those laws and federal mandates, and

insofar as DLC, CMS and the State's Certification & Licensing agency have similar mandates and responsibilities for investigating complaints, it is clear greater cooperation is not only mandated, but would better serve patients.

In an effort to facilitate increased cooperation, DLC will be contacting these and other agencies in the near future to set up a meeting to discuss how to improve inter-agency cooperation and effectiveness.

**H.     Alaska is in need of new care and treatment options in the community for patients recently released from API.**

According to Mr. Doe's records and interviews with API CEO Ron Adler and Dr. A, there was no where to discharge Mr. Doe to other than the homeless shelter. Mr. Doe did not have his own home, he was not welcome to live with his family, he did not have an assisted living facility, his only option was the shelter. This clearly demonstrates the lack of care and treatment options available in the community.  Mr. Doe is not the only API patient who has nowhere to go after discharge; it is a serious problem that needs attention.  The State needs new options for transitional care for those individuals who are homeless or without resources as a result of their stay in API.